UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES SOBUCKI III, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 1:19–cv–02279 |
| ) | |
| CENTRUM-EAST WEST ARENAS ) | Judge: Hon. Mary M. Rowland |
| VENTURE, LLC, d/b/a FOX VALLEY ) | |
| ICE ARENA, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Centrum-East West Arenas Venture, LLC, d/b/a Fox Valley Ice Arena, by their attorneys, Linda K. Horras and Thaddeus A. Harrell of Hinshaw & Culbertson LLP, submit this Memorandum of Law in support of their Rule 56 Motion for Summary Judgment.

### I.  INTRODUCTION

Centrum operates a large suburban sports complex that includes two regulation ice rinks and all that goes with it—locker rooms, ice, boards, and programming for multiple teams and skating competitions that come in and out its doors. Plaintiff held one of a small number of management positions at Fox Valley and was directly responsible for the critical Operations Department and managing all of this expensive capital and the staff that maintained it. He was exempt from overtime under the executive exemption. Plaintiff further admits that his discharge was unrelated to any protected activity and thus his retaliation claim fails as well. Centrum is therefore entitled to summary judgment as a matter of law.

## I.  STATEMENT UNDISPUTED FACTS

### A. Background

Fox Valley is a public skating and fitness facility comprising of two ice rinks, a full service fitness center and a bar and restaurant located in Geneva, Illinois. (Dec. Welker ¶ 3). It is one of the largest ice facilities in the Chicago area covering over 300,000 square feet. (*Id*.). The facility operates a 200' x 85' NHL official sized rink and a 200' x 100' international sized rink, and is home to the USHL Chicago Steel, Cyclones Amateur Hockey Association, and partners with other organizations for events and programming. (Dec. Welker ¶ 4).

Fox Valley has six departments: a fitness center, front office, hockey school, human resources, operations, and skate school, each headed by a manager or director. (Dec. Welker ¶ 6). Fox Valley is typically open daily from 6:00 a.m. until 11:00 p.m., though hours vary to accommodate a hockey season or figure skating competition. (Dec. Welker ¶ 5). Fox Valley typically has a manager on duty during prime hours to meet the needs of customers and visitors, resolve problems with customers and staff, and supervise hourly staff. (Dec. Welker ¶ 7).

Craig Welker is Fox Valley's General Manager, its highest-level executive. (Dep. Of Craig Welker, p. 7 ¶¶ 8-18). From August 2014 to May 31, 2019, Welker held dual management roles at Fox Valley and Leafs Ice Arena ("Leafs"), a separate arena in West Dundee, Illinois. (*Id*.). Welker's primary responsibility includes developing growth strategies, budgets, forecasting, contracting with vendors and overall responsibility for staff. (Dec. Welker ¶ 2).

Matt Leonard was employed as the Director of Operations, the second highest-level executive at Centrum. (Dep. of Matt Leonard; p. 39 ¶¶ 12-24; p. 40 ¶¶ 1-15). Until the creation of the Head of Operations position, he was responsible for the management of the operations departments and all operations staff at both facilities. (Dep. Leonard, p. 8 ¶¶ 22-24; p. 9 ¶¶ 1-3; Dec. Leonard ¶ 2).

2

Plaintiff joined Fox Valley in October of 2012, having obtained a sports management degree earlier that year. (Dep. of James Sobucki, p. 11 ¶ 24; p. 12 ¶¶ 1-7). He had applied for a position in marketing or operations and was hired as an hourly office employee. (Dep. Sobucki, p. 14 ¶¶ 2-16; Exh. 2). His claim does not involve his time in that position. (Dkt. 21, Am. Cp. ¶¶ 15; Dep. Sobucki, p. 15 ¶¶ 14-16; p. 15 ¶¶ 22-24; p. 17 ¶¶ 12-16).

In July 2014, Plaintiff was promoted to Office Manager and transitioned from non-exempt to an admittedly salaried-exempt employee. (Dkt. 21, Am. Cp. ¶ 16; Dep. Sobucki, p. 20 ¶¶ 7-24; p. 21 ¶¶ 1-3; Exh. 4). In that capacity, he supervised a staff and oversaw ice rentals by private groups and parties. (Dep. Sobucki, p. 21 ¶¶ 12-21; p. 27 ¶¶ 6-8; p. 29 ¶¶ 6-24; Def. Resp. to Inter. ¶ 4; Dec. Welker ¶ 8). He interacted with customers and resolved issues with accounts, costs, and ice availability, and managed the company's social media. (*Id.*). Plaintiff's claims only relate to the time that he was the Head of Operations.

## B. Head of Operations Position

In January 2016, Welker created a new management position of Head of Operations at Fox Valley, in part because of the demands on Leonard who split his time between the two facilities. (Dep. Welker, p. 12 ¶¶ 11-24; p. 73 ¶¶ 5-13; Def. Resp. to Inter. ¶ 4; Dec. Welker ¶ 9). The addition of this position guaranteed that an operations manager was available at Fox Valley during critical business hours. (*Id.*). The Head of Operations is responsible for the facility's ice rinks and is pivotal to Fox Valley's success. (Dec. Leonard ¶ 5).

The operations department is responsible for Fox Valley's primary capital: the ice, two Zambonis ($150,000.00 each); an ice refrigerant plant ($1,000,000.00); and the flooring, refrigerant, boards, glass and other components that make up each rink totaling another $1,500,000.00. (Dec. Leonard ¶ 7). Fox Valley managers must attend a three-day training course

3

through the U.S. Ice Rink Association for professional instruction on the installation, maintenance and repair of this capital. (Dep. Welker, p. 95 ¶¶ 6-22; Dec. Welker ¶ 10). Plaintiff attended this training in August 2015. (Dec. Welker ¶ 11).

In or around January of 2016, Welker met with Plaintiff to discuss his employment. (Dep. Sobucki, p. 32 ¶¶ 7-15; Dep. Welker, p. 11 ¶¶ 11-24; p. 12 ¶¶ 1-8; p. 12 ¶¶ 11-19; Def. Resp. to Inter. ¶ 4). Welker explained that Plaintiff was not a good fit as the Office Manager due to repeated errors in the social media accounts and Welker was trying to find the best fit for him. (*Id*.). Welker felt Plaintiff was a good candidate for the new operations position given his three years of institutional knowledge and due to difficulties Welker had attracting qualified talent. (Dec. Welker ¶ 12). Welker also explained that Plaintiff could transition to an hourly operations employee if he did not want another management position. (Dep. Sobucki, p. 34 ¶¶ 8-14; Dep. Welker, p. 11 ¶¶ 19-24; p. 12 ¶¶ 1-8; p. 70 ¶¶ 5-20).

Welker explained that the Head of Operations managed the entire operations department from the supervision, training and job assignments of the hourly staff to the management of Fox Valley's primary capital (i.e., ice, equipment, boards and glass) and managing critical customer/account relationships. (Dep. Sobucki, p. 34 ¶¶ 18-20; Dec. Welker ¶ 14). Plaintiff does not recall what duties were described, but states that he did not question them. (Dep. Sobucki, p. 34 ¶¶ 21-23; Dep. Welker, p. 74 ¶ 24; p. 75, ¶¶ 1-4). Plaintiff accepted the management position. (Dep. Sobucki, p. 34 ¶¶ 12-14; Exh. 4).

### C. Plaintiff's Management of Operations Department

Plaintiff was now the highest level operations manager at Fox Valley. (Dep. Sobucki, p. 85 ¶¶ 15-24; Dep. Leonard, p. 43 ¶¶ 5-21). As described below, Plaintiff was responsible for everything from staff to program logistics to handling key accounts. Plaintiff was at the same level

4

1019501\307036766.v1

as other managers/directors and was only subordinate to Leonard and Welker in terms of authority. (Dep. Sobucki, p. 85 ¶¶ 15-24; Dep. Leonard, p. 43 ¶¶ 5-21). As Plaintiff testified, he maintained the authority to do anything at any time. (Dep. Sobucki, p. 55 ¶¶ 4-24; p. 56 ¶¶ 1-4).

As the Head of Operations, Plaintiff worked directly with individuals and team coaches/managers to coordinate skating competitions, hockey games and other events. (Def. Resp. to Inter. ¶ 4; Dep. Sobucki, p. 40 ¶¶ 11-17; p. 46 ¶¶ 17-19; Dep. Leonard, p. 54 ¶¶ 21-24; p. 55 ¶¶ 1-9; Dep. Welker, p. 10 ¶ 24; p. 11 ¶¶ 1-14; p. 72 ¶¶ 16-24; p. 73 ¶¶ 1-2; p. 96 ¶¶ 22-24; p. 97 ¶¶ 1-11; Dec. Leonard ¶ 14). This included planning for and scheduling events with account managers; handling out-of-state team logistics; and determining proper set up and tear down as well as assigning staff to cover these tasks and events**.** **(**Dep. Leonard, p. 47 ¶¶ 15-24; p. 48 ¶¶ 1-3; Dep. Welker, p 78 ¶¶ 1-14; p. 79 ¶¶ 20-24). Plaintiff also addressed all issues relating to the ice rinks, bleachers and locker rooms as the manager on duty and dealt with parents and guest concerning their children on and off the ice. (*Id*.).

For instance, Plaintiff managed the Chicago Steel Hockey Club account. (Dep. Leonard, p. 47, ¶¶ 15-24; p. 48, ¶¶ 1-3; Dep. Welker, p 78; ¶¶ 1-14; p. 79, ¶¶ 20-24). Plaintiff worked with Club managers to identify their game day needs and then determined proper game day logistics, such as the setup and tear down needed, and how best to staff the events so that the team's needs were met. (*Id*.). Similarly, Plaintiff regularly worked with staff for professional figure skaters, the Cyclones Hockey Association and Aurora University and managed the logistics for them as he did for the Chicago Steel. (Dep. Leonard, p. 47 ¶¶ 15-24; p. 48 ¶¶ 1-7; p. 54 ¶¶ 21-24; p. 55 ¶¶ 1-9; Dep. Welker, p. 75 ¶¶ 21-23; p. 76 ¶¶ 15-20).

Plaintiff supervised a staff of custodians and drivers involved in the maintenance of the ice rinks and operations areas. (Dep. Leonard, p. 75 ¶¶ 13-23; Dep. Welker, p. 75 ¶¶ 11-16; p. 76 ¶¶

5

1-6; Dec. Leonard ¶ 15). Custodians are responsible for the cleanliness of the locker rooms, public restrooms, bleachers, and the main lobby. (Dec. Leonard ¶ 16). Drivers perform ice resurfacing, monitor the bleachers and locker rooms, and performing light cleaning. (Dec. Leonard ¶ 17). Plaintiff scheduled this staff to provide coverage for events and programs, such as ensuring that an appropriate number of drivers to handle each event/program, and he oversaw their work to ensure proper ice resurfacing and conditions. (Dep. Sobucki, p. 86 ¶¶ 4-11; Dep. Leonard, p. 48 ¶ 24; p. 49 ¶¶ 1-2; Dep. Welker, p. 80 ¶¶ 12-16; Dec. Welker ¶ 29). He also handled all issues with customers and guests at these events as well. (Dep. Leonard, p. 47 ¶¶ 15-24; p. 48 ¶¶ 1-3; Dep. Welker, p. 79 ¶¶ 20-24; p 78 ¶¶ 1-14).

Critical to the operations department is the ice and maintaining it is more than just driving a machine. (Dec. Leonard ¶ 8). Using Fox Valley's NHL-sized rink as an example, it holds 10,600 gallons of water that must remain between 18°F to 24°F. (*Id*.). The temperature is lowered to 16°F in order to paint the ice (such as the blue and center lines). (*Id*.). For proper usage, ice must remain at three quarters to one and one half inch thick. (Dec. Leonard ¶ 9). Any thicker and the ice becomes softer and slower for skaters. (*Id*.). The Head of Operations, however, had the authority to increase the thickness of the ice based on anticipated usage due to the number of resurfaces that may take place. (*Id*.). Bad ice resurfacing can cause the ice to be unlevel and require emergency maintenance. (Dec. Leonard ¶ 10). In the case of improper resurfacing, Plaintiff was called on to inspect the ice and either assign a driver to correct it or handle the resurfacing himself. (*Id*.).

Plaintiff also ordered and managed supplies such as equipment blades, refrigerant and cleaning products for the department, with no set budget based on the fluidity of the items required at any given time. (Dep. Sobucki, p. 80 ¶¶ 8-21; Dec. Leonard ¶ 13). The Head of Operations also has access to the facility's operating software known as "Max Galaxy", which allows for the

6

review of costs, ice schedules, and registrations. (Dep. Welker, p. 78 ¶¶ 20-24; p. 79 ¶¶ 1-13). Plaintiff also used this system to check inventory and order supplies. (*Id.*). Hourly employees are not provided access at this level. (*Id.*). Plaintiff also performed some non-exempt duties, like resurfacing the ice, and he estimated he did five to ten minutes each hour. (Dep. Sobucki, p. 49 ¶¶ 8-15; Dep. Leonard, p. 74 ¶¶ 12-16; Dep. Welker, p. 79 ¶¶ 14-16).

Plaintiff and Leonard were the only management employees in the operations department at Fox Valley. Outside of Leonard who split his time between two facilities, Plaintiff was the highest level manager in the Fox Valley Operations Department. (Dep. Leonard, p. 43 ¶¶ 5-14; Def. Second Supp. Discl. pp 1854 - 1859). All other operations staff were hourly employees earning an average of $11.58/hour. (*Id.*). Plaintiff, on the other hand, earned a salary at least $455/week. (Dep. Sobucki, Exh. 4). Plaintiff did not clock in or out; instead he, like other managers, tracked time in a log book. (Dep. Welker, p. 82 ¶¶ 13-23; p. 83 ¶¶ 6-13; Exhibit 6; Def. Resp. to Inter. ¶ 5). Plaintiff maintained the autonomy to determine his hours and was not required to contact Leonard or Welker at the end of the day. (Dep. Sobucki, p. 58 ¶¶ 15-17; Dep. Leonard, p. 75 ¶ 24; p. 76 ¶¶ 1-18; p. 77 ¶¶ 7-24; p. 78 ¶¶ 1-6; p. 80 ¶¶ 13-24; p. 81 ¶¶ 1-2).

### D. Direction of Staff

As noted, Plaintiff supervised custodians and drivers. (Dep. Leonard, p. 75 ¶¶ 13-23; Dep. Welker, p. 75 ¶¶ 11-16; p. 76, ¶¶ 1-6). Because the number of staff varied based on activity levels, an analysis of payroll reports is necessary. For example, during the week of May 17, 2019 to May 30, 2019, Plaintiff supervised eight employees working the following hours: Ryan (41.75); Drews (4.75); Green (5.50); Norman (59.50); Pickren (63.50); Ramos (14.00); Sooy (35.00); and Sturgeon (39.50). (Def. Second Supp. Discl., p. 1854). This totals 236.5 hours or the equivalent of approximately 3.0 full time employees. (*Id.*). During the period of December 28, 2018 to January

7

10, 2019, Plaintiff supervised nine employees with the following hours: Differding (31.50); Drews (11.50); Flores (32.25); Glas (62.25); Nealey (28.75); Norman (35.75); Pickren (80.25); Sooy (40.25); and Sturgeon (22.25). (Def. Second Supp. Discl., pp, 1854; 1859). This is 344.75 total hours, or the equivalent of 4.3 full time employees. (Def. Second Supp. Discl., pp. 1854; 1859).

Plaintiff was integrally involved in employment decisions his staff. (Dep. Leonard, p. 46 ¶¶ 1-6; p. 55 ¶¶ 22-24; p. 56 ¶¶ 1-5; Dep. Welker, p. 80 ¶¶ 17-24; p. 81 ¶¶ 1-5). Plaintiff worked with Leonard to discuss his staffing needs and provide his input and recommendations. (Dep. Welker, p. 96 ¶¶ 5-18; Dec. Leonard ¶ 21). In a collaborative effort, Leonard screened and hired applicants, while Plaintiff trained and evaluated each employee's performance during their 90 day probationary period. (Dec. Leonard ¶ 22). Upon completing probation, Plaintiff made his recommendations to Leonard on whether the employee should be hired on a permanent basis or terminated. (Dep. Leonard, p. 20 ¶¶ 5-15; p. 55 ¶¶ 20-24; p. 56 ¶¶ 1-5; Dec. Leonard ¶ 23). Plaintiff participated in the discipline and termination of employees with Leonard. (Dep. Leonard, p. 20 ¶¶ 5-15; Dec. Leonard ¶ 24). Leonard gave Plaintiff's recommendations significant weight due to Plaintiff's experience and knowledge at Fox Valley. (Dep. Welker, p. 80 ¶ 24; p. 81 ¶¶ 1-5; Dep. Leonard, p. 55 ¶¶ 12-18; Dec. Leonard ¶ 20).

Together with his supervisor, Leonard, Plaintiff also developed and implemented a training program for his staff. (Dep. Leonard, p. 45 ¶¶ 2-24; p. 55 ¶¶ 12-18). Driver training takes one to two weeks and involves Plaintiff providing education in proper ice maintenance, the mechanics of driving the Zamboni, proper resurfacing techniques and basic arena refrigeration standards for the two rinks. (Dec. Leonard ¶ 19). Plaintiff's training program also covered facility set up and proper closure procedures. (Dep. Leonard, p. 45 ¶¶ 2-12; Dep. Welker, p. 78 ¶¶ 2-7; Dec. Leonard ¶ 19).

### E. Sale of Leafs and Consolidation with Fox Valley

The Leafs facility was sold in February 2019 and Centrum's role there would soon end. (Def. Resp. to Inter. ¶ 17; Dep. Leonard, p. 52 ¶¶ 6-22; Dep. Welker, p. 20 ¶¶ 1-18; p. 88 ¶¶ 21-23). Centrum personnel at Leafs were either going to be separated or transferred to Fox Valley, depending on need and their skills sets. (*Id*.). Welker and President Tim Weiland analyzed staff at Leafs and determined that its operations director and hockey manager had stronger skills sets and work ethics than those incumbents at Fox Valley. (Dep. Welker, p. 21 ¶¶ 21-24; p. 89 ¶¶ 1-20). This meant that Plaintiff and another manager would be separated. (*Id.*). The Fox Valley Human Resources position was also eliminated. (Dep. Welker, p. 21 ¶¶ 21-24; p. 89 ¶¶ 1-20). These decisions were made in February 2019, though the transition out of Leafs' management took place over the next three months. (Dep. Welker, p. 62 ¶¶ 6-24; p. 63 ¶¶ 1-6; p. 88 ¶¶ 21-24; p. 89 ¶¶ 1-21; Dec. Welker ¶ 17).

The decision to replace Plaintiff was based on several factors. First, Plaintiff had informed Mr. Welker in December of 2018 that he was using his position at Centrum to advance his career and would seek alternate employment. (Dep. Sobucki, 62 ¶¶ 18-24; p. 63 ¶¶ 1-24). Second, Plaintiff's replacement had more operations experience and operational knowledge, demonstrated greater motivation, and expressed his desire to be a long term employee of the company. (Dec. Welker ¶ 18).

On April 3, 2019, Plaintiff filed his complaint. (Dkt. 1). This was the first time Mr. Welker learned that Plaintiff allegedly had wage concerns. (Dep. Sobucki, p. 70 ¶¶ 1-24; p. 71 ¶¶ 1-7; Dep. Welker, p. 45 ¶¶ 16-21; p. 46 ¶¶ 1-18; p. 47 ¶¶ 10-15; p. 91 ¶¶ 10-18; Dec. Welker ¶ 19). Nonetheless, in keeping with the staffing plan, Plaintiff was separated on May 31, 2019 and told that he was being let go due to the restructuring necessitated by the Leafs' closure. (Dep. Sobucki,

9

p. 68 ¶¶ 21-24; p. 69 ¶¶ 1-12; Dep. Welker, p. 93 ¶¶ 19-24; p. 94 ¶¶ 1-4). Plaintiff admits that his discharge was not in response to his Complaint. (Dep. Sobucki, p. 71 ¶¶ 11-13).

### III. ARGUMENT

#### A. Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute of a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary judgment, facts are "viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The non-movant must then set forth specific facts that are in dispute and warrant a trial. *Anderson*, 477 U.S. at 255.

#### B. Plaintiff was Exempt under Federal and Illinois law

Overtime compensation is not required for those employed in a bona fide executive capacity. 29 U.S.C. § 213(a)(1); 820 ILCS 105/4a(2)(E); *Ottaviano v. Home Depot, Inc., USA*, 701 F. Supp. 2d 1005, 1008 (7th Cir. 2010) (Illinois law adopts FLSA exemptions). An executive employee is: (1) paid a salary of a certain level; (2) has the primary duty of managing a recognized department; (3) directs the work of two or more employees; and (4) has the authority to hire or fire or whose input into those decisions has "particular weight." 29 CFR § 541.100; 820 ILCS 105/4a(2)(E). The first factor is not in dispute as Plaintiff earned a salary of at least $455/week as the Head of Operations. (Dep. Sobucki, p. 34 ¶¶ 12-14; Exh. 4). Similarly, there is no dispute that Operations is a recognized (and pivotal) department of Fox Valley. (Dec. Welker ¶ 6).

1. ***Primary Duty Was Management of Operations Department***

The term "management" involves directing the work of staff, planning and assigning their work, and determining the materials or supplies to be bought. 29 C.F.R. § 541.102. *See Demos v. City of Indianapolis*, 302 F.3d 698, 706 (7th Cir. 2002) (Facilities Maintenance Supervisor was exempt as most of his work time was spent managing other employees and at least forty percent of his time was related to management); *See also See Holt v. City of Battle Creek*, 925 F.3d 905, 911 (6th Cir. 2019) (Plaintiff's primary duty was management of the City's fire department and that he was required to directly supervise lower-ranking personnel, evaluate them, administer and enforce department policy, and coordinate the day-to-day operations of the department).

To use the parlance of the FLSA, management responsibilities must be the "primary duties" of the position. 29 C.F.R. § 541.700(a). The term "primary duty" means the principal, main, major or most important duty that the employee performs. 29 C.F.R. § 541.1(f). Relevant factors include (1) the relative importance of the exempt duties as compared with other duties (2) the amount of time spent on exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to nonexempt staff. 29 C.F.R. § 541.700(a).

In *Stephenson v. TCC Wireless, LLC,* No. 17-cv-7258, 2019 U.S. Dist. LEXIS 92600 (N.D. Ill. June 3, 2019), Plaintiff was the highest-ranking manager at a retail store and supervised up to five sales associates at any given time. *Id*. at *2. Plaintiff participated in interviewing potential sales associates and made hiring and disciplinary recommendations to her superiors that were typically followed. *Id*. She was responsible for the store's daily operations, generating sales, scheduling staff meetings, and reviewing sales statistics. *Id*. at *3. The court held summary judgment was appropriate based on the executive exemption. *Id*. at *12. *See also Cooney v. City*

11

*of Chicago*, 644 F. Supp. 2d 1061 (N.D. Ill. 2009) (summary judgment in favor of employer holding that the Superintendents were exempt employees).

Here, Plaintiff was often the highest level operations manager at Fox Valley. (Dep. Sobucki, p. 85 ¶¶ 15-24; Dep. Leonard, p. 43 ¶¶ 5-21). He was primarily responsible for management of the rinks, equipment, and operations areas; determined what duties needed to be done and assigned them; and supervised the staff performing those duties. (Dep. Sobucki, p. 86 ¶¶ 4-11; Dep. Leonard, p. 42 ¶¶ 19-24; p. 43 ¶¶ 1-4; p. 48 ¶ 24; p. 49 ¶¶ 1-2; Dep. Welker, p. 72 ¶¶ 16-24; p. 73 ¶¶ 1-2; p. 80 ¶¶ 12-16). He had the authority to order all supplies needed for the department. (Dep. Sobucki, p. 80 ¶¶ 8-21; Dec. Leonard ¶ 13; Dep. Welker, p. 78 ¶¶ 20-24; p. 79 ¶¶ 1-13). Plaintiff also coordinated ice programs with directly with customers and key accounts, developed a logistical plan for these programs, and ensured these events were properly scheduled, staffed and supervised. (Dep. Leonard, p. 47 ¶¶ 15-24; p. 48 ¶¶ 1-3; Dep. Welker, p. 79 ¶¶ 20-24; p 78 ¶¶ 1-14).

Plaintiff's performance of non-exempt duties is not fatal. "Time [allocation] alone … is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work." § 541.700(b); See also, 29 C.F.R. § 541.106(a) ("Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption."). In short, Plaintiff's primary responsibility was managing the operations department.

### 2. *Freedom from Direct Supervision*

Plaintiff maintained the autonomy to determine what work needed to be completed and the means of completion. As he testified, he maintained the authority to do anything at any time. (Dep. Sobucki, p. 55 ¶¶ 4-24; p. 56 ¶¶ 1-4). He determined his hours. (Dep. Sobucki, p. 58 ¶¶ 15-17;

12

Dep. Leonard, p. 75 ¶ 24; p. 76 ¶¶ 1-18; p. 77 ¶¶ 7-24; p. 78 ¶¶ 1-6; p. 80 ¶¶ 13-24; p. 81 ¶¶ 1-2). He was the primary contact with accounts and handled programming with the account from logistics to staff assignment and supervision. (Dep. Leonard, p. 47 ¶¶ 15-24; p. 48 ¶¶ 1-3; Dep. Welker, p. 80 ¶¶ 2-11). He inspected the facility and assigned work that needed to be done. (Dep. Leonard, p. 42 ¶¶ 19-24; p. 43 ¶¶ 1-4; Dec. Leonard ¶ 11; Dep. Welker, p. 72 ¶¶ 16-24; p. 73 ¶¶ 1-2).

In fact, Leonard split his time between two geographically different facilities that left Plaintiff as the only operations manager at Fox Valley. *See Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 507 (6th Cir. 2007) (explaining that this factor "does not demand complete freedom from supervision, such that plaintiff is answerable to no one, as this would disqualify all but the chief executive officer from satisfying this factor of the primary duty inquiry"); *see also Jones v. Va. Oil Co., Inc.*, 69 Fed. App'x 633, 638 (4th Cir. 2003) (the fact that plaintiff's supervisor regularly stopped by the store and sometimes helped the plaintiff with tasks did not negate a finding that the plaintiff was free from direct supervision).

### 3. *Relationship between Plaintiff's salary and Wages paid to His Staff*

Plaintiff and Leonard were the only salaried operations employees. (Dep. Leonard, p. 43 ¶¶ 5-14; Def. Second Supp. Discl. pp. 1854-1859). Plaintiff's staff earned an average of $11.58/hour and worked approximately 16.4 hours per week (or $189.90/week). (*Id*.). Plaintiff was earning $703.08/week by the end of his employment and was clearly paid commensurate to his managerial duties. (Dep. Sobucki, p. 34 ¶¶ 12-14; Exh. 4).

### 4. *Plaintiff's Supervision of Staff*

An executive employee must customarily and regularly direct the work of two or more other employees. 29 C.F.R. § 541.100(a)(3). This supervision can be distributed among two or

13

more employees as long as it meets the "two or more" full-time employees or the equivalent. 29 C.F.R. § 541.104. *See Baudin v. Courtesy Litho Arts*, 24 F. Supp. 2d 887, 893 (N.D. Ill. 1998) (summary judgment in favor of employer where plaintiff's duties included the customary and regular supervision of six or seven employees who worked in the pre-press department on the day and night shifts); *Light v. MAPCO Petroleum, Inc.*, No. 3:04-0460, 2005 U.S. Dist. LEXIS 45756, at *25 (M.D. Tenn. Aug. 4, 2005) (summary judgment in in favor of employer where Plaintiff supervised up to six part time employees).

Similar to *Baudin* and *Light*, Plaintiff supervised a group of six to ten part time custodians and drivers. (Dep. Leonard, p. 75 ¶¶ 13-23; Dec. Leonard ¶ 15; Dep. Welker, p. 75 ¶¶ 11-16; p. 76, ¶¶ 1-6). He regularly assigned tasks, monitored work and supervised the work of his staff. (*Id.*). These part-time employees amounted to at least two FTEs. For instance, during the week of May 17, 2019 through May 30, 2019, Plaintiff supervised eight employees with a total of 236.5 hours (the equivalent of 3.0 full time employees). (Def. Second Supp. Discl. p. 1854). The same analysis can be made of other time periods. (*See, i.e.,* Def. Second Supp. Discl. p. 1859).

Plaintiff also had decision-making authority and input involving his staff. (Dep. Leonard, p. 46 ¶¶ 1-6; p. 55, ¶¶ 22-24; p. 56 ¶¶ 1-5; Dep. Welker, p. 80 ¶¶ 17-24; p. 81 ¶¶ 1-5). Plaintiff worked with Leonard to discuss staffing needs and provide his recommendations. (Dep. Welker, p. 96 ¶¶ 5-18; Dec. Leonard ¶ 21). In a collaborative effort, Leonard screened and hired applicants, while Plaintiff trained and evaluated each employee's performance during their 90 day probationary period. Upon completing their 90 day period, Plaintiff made his recommendations to Leonard on whether the employee should be hired on a permanent basis or terminated. (Dep. Leonard, p. 20 ¶¶ 5-15; p. 55 ¶¶ 20-24; p. 56 ¶¶ 1-5). Plaintiff also participated in disciplinary and termination meeting with Leonard. (Dep. Leonard, p. 20 ¶¶ 5-15; Dec. Leonard ¶ 24). Plaintiff's

recommendations carried great weight as a senior member of the operations department. (Dec. Leonard ¶ 20; Dep. Welker, p. 80 ¶ 24; p. 81 ¶¶ 1-5)**.**

### C. Retaliation Claim Fails

The FLSA prohibits employers from discharging an employee who has filed a FLSA complaint. 29 U.S.C. § 215(a)(3). Retaliation can be established through direct or indirect evidence. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012) (direct evidence involves showing that Plaintiff engaged in protected expression; was adversely affected, and a causal link exists between the two); *Cichon v. Exelon Generation Co., LLC,* 401 F.3d 803 (7th Cir. 2005) (indirect method involves showing protected activity; an adverse action; acceptable job performance; and plaintiff was treated less favorably than a similarly situated employee).

Plaintiff admits that his termination unrelated to his lawsuit. (Dep. Sobucki, p. 71 ¶¶ 11-17). The undisputed facts further reflect that the decision to terminate his employment was made months prior his lawsuit. (Dep. Welker, p. 21 ¶¶ 21-24; p. 89 ¶¶ 1-20); s*ee Cichon,* 401 F.3d at 811 (employer had been "contemplating plaintiff's removal before it learned of the suit and employer need not suspend previously planned employment actions" upon learning of a FLSA action). Further, Plaintiff cannot identify any similarly situated employees treated more favorably nor has any evidence that Centrum's reasons were pretextual. *Cichon*, 401 F. 3d 803, 811 (assuming plaintiff established a *prima facie* case of retaliation, he failed to present any evidence establishing that the employer's proffered reasons for removing him were pretextual).

For all of the above reasons, summary judgment should be granted in favor of Defendant on all three of Plaintiff's claims.

Respectfully submitted,

**HINSHAW & CULBERTSON LLP**


By: <u>Thaddeus Harrell</u>
    One of Defendants' Attorneys

Linda K. Horras (ARDC #6200203)
Thaddeus A. Harrell (ARDC #6328871)
Hinshaw & Culbertson LLP
151 N. Franklin St., Suite 2500
Chicago, Illinois 60606
312-704-3000
312-704-3001

## **CERTIFICATE OF SERVICE**

I, the undersigned non-attorney on oath, state that on <u>November 20, 2020</u>, I served the above and foregoing **Defendants' Memorandum of Law in Support of its Motion for Summary Judgment Pursuant to L.R. 56.1(A)(3)** to the all counsel of record.

                                                                                                 <u>*/s/Cheree Woods*</u>
                                                                                                   Cheree Woods

1019501\307036766.v1