IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES SOBUCKI III,<br><br>Plaintiff,<br><br>v.<br><br>CENTRUM-EAST WEST ARENAS VENTURE, LLC, d/b/a FOX VALLEY ICE ARENA,<br><br>Defendant. | Case No. 19-cv-02279<br><br>Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Plaintiff James Sobucki alleges that his former employer, Centrum-East West Arenas Venture, LLC, failed to compensate him for overtime work in violation of the Fair Labor Standards Act (FLSA) and the Illinois Minimum Wage Law (IMWL). He also alleges that Centrum fired him in retaliation for filing the present lawsuit. For the reasons stated below, Centrum's Motion for Summary Judgment [54] is denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the

1

adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (internal quotations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (*citing Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

## BACKGROUND[1]

The parties and record describe two significantly different accounts of the facts underlying this lawsuit. This section will summarize the relevant undisputed facts and describe the most important factual disagreements and their basis in the record.

---

[1] Centrum's Rule 56.1 Statement of Facts in support of its Motion for Summary Judgment (Dkt. 55) is abbreviated as "DSOF." Sobucki's Rule 56.1 Statement of Additional Facts and response to Centrum's Statement (Dkt. 75) is abbreviated as "PSOF." Centrum responded to that Statements of Fact at Dkt. 81.

**I. The Ice Rink**

Centrum is an Illinois limited liability company. DSOF ¶ 2. During the period at issue in this case, Centrum operated two ice rink facilities: Fox Valley Ice Arena in Geneva, Illinois, and Leafs Ice Arena in West Dundee. *Id.* at ¶¶ 2, 10. Craig Welker was the general manager, responsible for overseeing both facilities. *Id.* at ¶ 10. Beneath Welker were six departments: the fitness center, front office, human resources, operations, and the skate school. *Id.* at ¶ 8. Each of these was headed by a manager. *Id.* For the relevant period, Matt Leonard was the Director of Operations. *Id.* at ¶ 12. He was responsible for managing operations at both facilities and was the second highest executive. *Id.* at ¶ 12.

James Sobucki was employed by Centrum from November 2012 to May 31, 2019 at the Fox Valley location. *Id.* at ¶¶ 1-2. He was originally hired as an office employee, paid hourly. *Id.* at ¶ 17. He worked in that position until July 2014. *Id.* at ¶ 17. Sobucki was then promoted to a salaried office manager role. *Id.* at ¶ 18. In January of 2016, Welker met with Sobucki and explained that Sobucki was not a good fit for the office manager role. *Id.* at ¶ 25. Welker told him that Centrum wished to find a role for which he was better suited. *Id.*

The parties disagree as to what happened next. According to the defendant, relying on a declaration supplied by Welker, Welker offered Sobucki a choice between two jobs. One option was to fill a newly created "Head of Operations" role. In that position, Sobucki would be paid a salary and would be responsible for managing the operation and maintenance of the Fox Valley arena. *Id.* at ¶¶ 21, 28. Alternatively, if

3

he did not want a management position, he could become an hourly operations employee responsible for tasks like driving the Zamboni and cleaning the bathrooms. *Id.* at ¶ 28.

Sobucki, meanwhile, says he never heard the title "Head of Operations." PSOF, Resp. to ¶ 31. Instead, relying on his own declaration and deposition, he says that he was only offered a non-management position focused on Zamboni driving and custodial work. PSOF at ¶¶ 83-84. He was told, however, that he could have his pay calculated on an hourly basis or as a salary. PSOF at ¶ 84. In either case, Sobucki chose the salary and began working with a weekly salary of at least $455 per week. DSOF at ¶ 31.

**II. Sobucki in Operations**

The parties present two very different accounts of Sobucki's work in operations. Centrum, drawing primarily on testimony from Leonard and Welker, say that Sobucki was the highest-level operations manager at Fox Valley and was subordinate only to Leonard and Welker. *Id.* at ¶ 37. Among his responsibilities were assigning daily tasks to a staff of drivers and custodians and monitoring them throughout the day. *Id.* at ¶ 39. Depending on the season he could have as many ten part-time employees under his management, more than the equivalent of two full-time employees. *Id.* at ¶¶ 48, 58-59. He was also involved in the training of new staff and his opinion was given considerable weight when making hiring or firing decisions. *Id.* at ¶¶ 52, 65. He also ordered and managed supplies and inventory. *Id.* at ¶¶ 43-44.

4

As Head of Operations, Sobucki worked with customers to coordinate skating competitions and hockey games for the rinks. *Id.* at ¶ 45. He assisted with a wide variety of issues, including scheduling, managing logistics for out-of-state participants, planning the set-up for the events, providing directions, and addressing issues related to the rink, bleachers, and locker room. *Id.* In his deposition, Leonard highlighted Sobucki's close working relationship with the Chicago Steel hockey club, for which he was the primary contact. *Id.* at ¶ 46.

Sobucki, meanwhile, relies primarily on his own deposition and declaration to argue that he was essentially a custodian. He says that his duties primarily involved operating the Zamboni, cleaning the facility, and stocking items like toilet paper and paper towels. PSOF ¶ 83. He frequently was the only Zamboni driver present when he was working. *Id.* at ¶ 88. He did not supervise any employees and did not assign work on a daily business. *Id.* at ¶ 87. He was also not responsible for setting work schedules. *Id.* at ¶ 91.

Sobucki does acknowledge that he would occasionally ask employees for help in completing tasks. *Id.* at ¶ 87. Sobucki would also field questions from other employees and occasionally divvy up tasks when Leonard and Welker were not present. *Id.* at ¶ 88. However, he did so because he was the most experienced employee, not because he had any formal management role. *Id.* Sobucki's interactions with clients were limited to helping set up tables and chairs ahead of events. *Id.* at ¶ 83. He was never responsible for any client accounts and did not serve as a primary contact for any clients. *Id.* at ¶ 90. He would, however, answer questions when help was requested.

*Id.* In this role he regularly worked more than 40 hours a week but was never paid overtime. *Id.* at ¶ 92. On April 3, 2019, Sobucki filed the present case in federal court, claiming violations of federal and state labor laws. *Id.*

### III. Sobucki's Firing

In February 2019, the other arena Centrum managed, Leafs, was sold. DSOF at ¶ 67. Centrum's management of the arena was ending, and so it was decided that employees at Leafs would either be fired or transferred to Fox Valley. *Id.* According to Welker's deposition, the operations director at Leafs was a stronger employee and it was decided that he would be transferred to Fox Valley and Sobucki, among others, would be fired. *Id.* at ¶ 68. The decision was made because Sobucki had mentioned that he was looking for other jobs and because his replacement was more experienced, more motivated, and more committed to the company. *Id.* at ¶¶ 71-72. Welker says that Sobucki was notified in February that changes were coming to his position and that he should prepare accordingly. Dkt. 81, Resp. to ¶ 100.

On April 8, 2019, five days after his lawsuit was filed, Welker met with the plaintiff. PSOF at ¶ 93. In his deposition, Sobucki could not remember the exact details of the conversation that took place, except that Welker asked questions about why he had filed the suit and, when Sobucki declined to respond, suggested that not answering his questions would be an issue. Dkt. 57 at 70. In a subsequent declaration, Sobucki stated that Welker asked if he was sure he wanted to "go down this road" and cited Centrum's employee handbook as evidence that he was an exempt employee. Dkt. 75-1 ¶ 16. When Sobucki said that he would not answer questions

6

without his lawyer, Welker responded that not answering his questions would be considered insubordination. *Id*. In Welker's deposition, meanwhile, he stated that their conversation ended after Sobucki said he would not answer questions. Dkt. 57 at 50.

On April 18 of that year, ten days after Welker questioned him about this lawsuit, Welker issued Sobucki an "Employee Warning Notice" for failing to properly log his hours worked. PSOF at ¶ 95.[2] On the notice, the consequence for further violations was noted as "[f]urther discipline and possible termination." *Id*. Three days after this notice, on April 22, 2019, Sobucki was issued another notice for arriving late to the arena, causing the director of a tournament to have to put out the hockey goals himself. *Id*. at ¶ 97. This time, the notice was issued by Leonard and warned that further infractions would result in a "final warning and/or termination." *Id*. These were the only warning notices that Sobucki received at Centrum. *Id*. at ¶ 98.

Sobucki was fired on May 31, 2019. *Id.* at ¶ 100. He was told he was being let go due to the restructuring. *Id.* at ¶ 101. Sobucki asserts in his declaration that he was not given prior warning that he would be terminated on that day. *Id.* at 100. After his termination, he amended the present complaint to include a claim for retaliation.

## ANALYSIS

**I. FLSA Claim**

Under Illinois and federal law, employers are not required to pay overtime wages to "executive" employees. *See Ottaviano v. Home Depot, Inc., USA*, 701 F. Supp. 2d

---

[2] This was the second warning notice he received at Centrum, the first being three years earlier in 2016 when he was written up for wasting time at the front desk. *Id.* at ¶ 94.

1005, 1008 (N.D. Ill. 2010). Under the relevant regulations, an employee is an executive when: 1) her pay exceeds a regulatory minimum; 2) her "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;" 3) she "customarily and regularly directs the work of two or more other employees;" and 4) she "has the authority to hire or fire other employees or whose suggestions and recommendations . . . are given particular weight." 29 CFR § 541.100; 820 ILCS 105/4a(2)(E). Whether an employee satisfies these regulatory elements is a question of fact to be determined by a jury if in dispute. *See Bankston v. State of Ill.*, 60 F.3d 1249, 1253 (7th Cir. 1995) (finding that "it was reasonable for the jury to conclude that the plaintiffs were not exempt executive employees" and so the defendants were not entitled to judgment as a matter of law.); *see also Morgan v. Fam. Dollar Stores, Inc.*, 551 F.3d 1233, 1269 (11th Cir. 2008) (noting that the elements are "necessarily fact-intensive" and upholding the jury's determination).

Centrum asserts that Sobucki is an exempt executive and thus not entitled to overtime pay. Sobucki does not contest the pay element, and the record provides uncontroverted evidence that his suggestions as to hiring and firing were given particular weight, even if he did not have hiring and firing authority himself. The record also clearly shows, however, that there are material questions of fact as to the second and third elements.

According to Centrum, Sobucki was the Head of Operations at Fox Valley. He supervised the employees and assigned them work, he was responsible for training

8

employees and ordering supplies, and he worked closely with a variety of customers to meet their needs and coordinate their use of the facilities. Sobucki's testimony paints a very different picture. He does not directly dispute his involvement with training or ordering supplies. But his testimony asserts that his primary duties were driving the Zamboni and custodial work, and he often worked as the only Zamboni driver present. He did not supervise employees or assign tasks, and he had no formal title.

Centrum argues that Sobucki admits that he directed employee work, but Sobucki's testimony is that he sometimes answered questions and divvied up responsibilities as the most experienced employee—a team member coordinating with his coworkers, not manager assigning tasks. Consistent with this view, the plaintiffs concede that Sobucki did not set the department's work schedule. Sobucki also describes a very different relationship with customers, saying that his responsibilities were limited to setting up tables and answering questions when asked.

Sobucki's factual allegations draw primarily from his deposition and declaration. Centrum's, meanwhile, are grounded in the testimony of Leonard and Welker. It is, essentially, their word against his. At summary judgment, the Court is required to consider the evidence in the light most favorable to the non-moving party, Sobucki, in this case. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429,

467 (7th Cir. 2020) (*citing Anderson*, 477 U.S. at 255). Given the conflicting testimony as to whether Sobucki was an exempt executive, summary judgment must be denied.

Centrum offers two main objections to this reasoning. First, Centrum argues that Sobucki's testimony fails to create a genuine issue of fact because he claims he was not a manager without addressing the specific factual assertions made by Centrum. But this mischaracterizes the record. In his deposition and declaration, Sobucki does not simply state that he was not a manager—he lays out a coherent account of what his roles and responsibilities were as a Zamboni driver and custodian. This account contradicts specific factual claims made by Centrum, including that he supervised employees and that he worked closely with customers. Centrum's claims, meanwhile, rest on the testimony of two of its employees. It is up to a trier of fact to weigh the credibility of this opposing testimony.

Centrum also seeks to undermine the record Sobucki relies upon. Several of the clearest factual contradictions in the record arise from Sobucki's declaration. Centrum argues that the plaintiff cannot use a declaration to contradict deposition testimony. But the cases Centrum cites only limit the use of a declaration when it contradicts the declarant's previous deposition. *See Adelman-Tremblay v. Jewel Cos., Inc.*, 859 F.2d 517, 520 (7th Cir. 1988); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995); *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1171-72 (7th Cir. 1996). It offers no examples of declarations being rejected because they contradict the testimony of other witnesses. Sobucki's declaration, although at times

more detailed, is generally consistent with his deposition. As a result, summary judgment on the overtime claims is premature.

**II. Retaliation Claim**

Sobucki also alleges that he was fired in retaliation for filing the present FLSA claim. Centrum, meanwhile, insists that the decision to fire him was made because of the closing of Leafs and was unrelated to his legal actions. Retaliation is, itself, prohibited by FLSA. *See* 29 U.S.C. § 215(a)(3). In order state a claim of retaliation, a plaintiff "must plausibly allege that he engaged in activity protected under the Act, his employer took an adverse employment action against him, and a causal link exists between the two." *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 894 (7th Cir. 2018). Only the last element is at issue here. When analyzing such claims, courts draw on retaliation case law from both the FLSA and the Title VII context. *See O'Donnell v. Caine Weiner Co.*, LLC, 935 F.3d 549, 553 (7th Cir. 2019) (noting that "[t]he elements of the counts are nearly identical"); *Tolene v. T-Mobile, USA, Inc.*, 178 F. Supp. 3d 674, 682 (N.D. Ill. 2016) (citing *Harper v. C.R. England, Inc.*, 687 F.3d 297, 309 (7th Cir.2012), a Title VII case, in order to analyze FLSA and Title VII retaliation claims concurrently).

In this case, the record does not provide any direct evidence that Sobucki was fired because of his lawsuit. Instead, Sobucki relies on circumstantial evidence. "Circumstantial evidence, which allows a jury to infer retaliation, may include: (1) suspicious timing, ambiguous statements or behaviors; (2) evidence that similarly situated employees were treated differently; or (3) a pretextual reason for adverse

11

employment action." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 973 (7th Cir. 2012). When considering the timing of alleged retaliation, an "'interval of a few weeks or even months may provide probative evidence'" when there is "'corroborating evidence of retaliatory motive.'" *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016) (quoting *Castro v. DeVry University, Inc.*, 786 F.3d 559, 565 (7th Cir. 2015)). Close timing alone, however, "'will rarely be sufficient in and of itself to create a triable issue.'" *Harper v. C.R. England, Inc.*, 687 F.3d 297, 308 (7th Cir. 2012) (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir.2002)).

Sobucki does not offer evidence of similarly situated employees who were treated differently. He also does not directly demonstrate that Centrum's stated reasoning was pretextual. *Cf. Kasten*, 703 F.3d at 974 (reversing summary judgment where "[h]ours after management allegedly received an email indicating that Kasten had inquired about class action suits … Kasten was terminated. … [and] [h]e further suggests that others similarly situated to him that had not lodged complaints … were treated differently. … [and Defendant] offered pretextual reasons for his termination."). Instead, his argument rests on Welker's comments to him about the lawsuit five days after he filed the lawsuit being followed ten days later by a warning notice and three days later another written notice when he had not received a written notice in three years combined with the relatively short time between the filing of his lawsuit and his firing (58 days). The write-ups and timing, Sobucki contends, are enough to create a question of fact as to the reason he was fired.

12

This is a close case. The circumstantial evidence offered by Sobucki is weaker than the cases to which he analogizes. *Kasten* and *Garcia* both had tighter timing, more obviously concerning statements by decisionmakers, and clearer evidence of pretext. *Kasten*, 703 F.3d at 974; *Garcia v. Draw Enterprises III, LLC*, No. 17 C 4477, 2018 WL 6045206, at *9 (N.D. Ill. Nov. 19, 2018). On the other hand, Sobucki's retaliation claim does not depend only on timing, as Centrum contends. Instead, a reasonable jury could find the rapid issuance of two written warnings, after years without any, suspicious. The unusual resort to documented reprimands for relatively mundane missteps might have been intended to "set the stage" for covert retaliation. This may be true even if, as Sobucki concedes, he really was late to work and did, in fact, forgot to log his time. Similarly, Sobucki's meeting with Welker, where Welker suggested that the lawsuit was a mistake and allegedly expressed frustration when Sobucki would not discuss the issue, also may suggest retaliation was imminent. Although Sobucki could not remember, during his deposition, the exact words exchanged in the meeting, both his deposition and his declaration raise these ambiguous statements by Welker. These examples of "corroborating evidence" transform the two-month period between filing and firing into "probative evidence." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d at 1021.

Viewing the suspicious timing, actions, and statements together, Sobucki has raised a question of fact as to the reason for his firing. Based on this record, a reasonable jury could conclude that he was let go in retaliation for his FLSA lawsuit.

13

As a result, Centrum's Motion for Summary Judgment is denied as to the retaliation count.

## CONCLUSION

For the stated reasons, Centrum's Motion for Summary Judgment [54] is denied.

E N T E R:

Dated: August 5, 2021

_Mary M Rowland_

MARY M. ROWLAND
United States District Judge